#8/10

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| OMID DELKASH, | Case No. 5:25-cv-01675-HDV-AGR |
| Petitioner, | |
| | **ORDER GRANTING PRELIMINARY INJUNCTION [8]** |
| v. | |
| KRISTI NOEM, Secretary of the Department of Homeland Security et al., | |
| Respondents. | |

1    **I.    INTRODUCTION**

2    This case concerns the government's detention of a noncitizen and U.S. Army veteran, Omid

3    Delkash, who has lived in the United States for nearly 50 years.  Because Delkash was granted

4    withholding of removal to his native country of Iran, the government appears intent on deporting

5    him to an unidentified third country based ostensibly on convictions attendant to his service-related

6    substance abuse decades ago.

7    Before the Court is Delkash's Motion for Preliminary Injunction requesting his release from

8    custody and stay of his removal to a third country (the "Motion").  [Dkt. 8].  The briefing and

9    supporting evidence (or lack thereof) shows that the government has provided Delkash with a dearth

10    of due process throughout his detention.  Specifically, the government has utterly failed to comply

11    with the detailed requirements governing the revocation of release under 8 C.F.R. §§ 241.4(l) and

12    241.13(i), leaving Delkash and his attorney in the dark regarding the reasons for his recent detention

13    and depriving Delkash of an opportunity to present evidence as required.  While the government

14    may wish to wield its power to enforce immigration laws swiftly and forcefully, it cannot simply

15    ignore a noncitizen's statutorily-mandated opportunity to be heard.

16    Rules matter.  Hearings matter.  In recognition of this cornerstone principle of our

17    jurisprudence, a growing chorus of district courts have found that—in similar cases—the

18    government's unlawful detention and revocation of withholding warrants immediate release.

19    The Motion is granted.

20    **II.    BACKGROUND**

21    **A.    Factual Background**

22    Petitioner Omid Delkash is a native and citizen of Iran.  Motion, Ex. 1 [Declaration of Omid

23    Delkash in Support of *Ex Parte* Application for Temporary Restraining Order and Order to Show

24    Cause Re: Preliminary Injunction] ("Delkash Decl.") ¶ 1.  His family fled to the United States in the

25    1970s due to increasing political tensions in Iran.  *Id.*  He applied for asylum, which was granted in

26    1987, and became a permanent resident in 1989.  *Id.*

27    Delkash's father worked in the hotel industry, and his mother was a hairstylist.  *Id.* ¶ 2.

28    Because he "felt a call to something higher than [him]self," Delkash enlisted in the U.S. Army.  *Id.*

2

His military experience was difficult.  While in basic training, he was "hazed very heavily," called racial slurs, and beaten in the night repeatedly by his fellow trainees.  *Id*. ¶ 4.  He ultimately ended up training as a medic and completed eight years of service in Corona, California treating injuries on the base before being honorably discharged.  *Id*. ¶ 6; Motion, Ex. 4.

After his military service, Delkash worked in auto insurance sales.  Delkash Decl. ¶ 7.  He soon developed a substance abuse problem, which he states would "numb my brain" and resulted in "not having the nightmares of the beatings from Fort Knox."  *Id.*  From 1990 to 1997, Delkash was convicted of and served prison time for several offenses, including forgery, check fraud, burglary, and possession of a controlled substance.  Declaration of Lourdes Palacios in Support of Respondents' Opposition to Motion for Preliminary Injunction ("Palacios Decl.") ¶¶ 5–8.

In 1998, Delkash was summoned to appear in front of the former Immigration and Naturalization Services and was ultimately charged with being deportable.  *Id*. ¶ 9.  While in removal proceedings, Delkash was convicted of additional offenses for attempted possession of a controlled substance, unlawful taking of a vehicle, forgery, and second degree burglary.  *Id*. ¶¶ 10–12.  In January 2001, an immigration judge ordered Delkash removed.  Motion, Ex. 2.  But his application for withholding of removal was granted, and he was released from custody.  *Id*.; Palacios Decl. ¶ 13; Delkash Decl. ¶ 9.  Delkash was not issued an order of supervision.  Delkash Decl. ¶ 9.

Between when his withholding of removal was granted and 2018, Delkash was convicted of several additional misdemeanor offenses relating to his continued substance and alcohol abuse.  Palacios Decl. ¶¶ 15–24.  Delkash then (for the most part) stabilized his life.[1]  He began working in the mortgage industry, married, and raised two children.  Delkash Decl. ¶ 10.  Delkash has also not been asked to check in with Immigration and Customs Enforcement ("ICE") for the past 24 years.  *Id.* ¶ 9.

On June 24, 2025, while Delkash was driving from his workplace to lunch, he was pulled over by four SUVs with flashing emergency lights.  *Id*. ¶ 11.  Delkash reports that several ICE

---

[1] In April 2025, Delkash was arrested for alleged violation of a domestic violence restraining order.  Palacios Decl. ¶ 25.  No charges were filed for this recent arrest.  [Dkt. 17-1 at 9].

officers pointed firearms at him and told him to "get out of the car or we will shoot you."  *Id.*

Delkash alleges that the officers did not identify themselves when asked, but that they were wearing

tactical body armor bearing the Department of Homeland Security ("DHS"), ICE, and police

identifiers.  *Id.* ¶ 12; Palacios Decl. ¶ 30.  The only response Delkash reports receiving from the

officers about what was going on was the brief statement:  "I have a federal warrant for you because

you are from Iran."  Delkash Decl. ¶ 12.

During the arrest Delkash alleges that the officers slammed his head against the car causing

his dental implant to fall out, which he was not able to recover.  *Id.*  The officers drove Delkash to a

federal building in Santa Ana, California, where he says he was told that he would be deported to

South Sudan.  *Id.* ¶ 13.  Delkash was then transported to a federal building in Los Angeles and

placed in a ten by twenty foot room with approximately forty to fifty other men.  *Id.* ¶ 14.  There was

one toilet in the room that leaked urine and feces; Delkash stayed there for four nights.  *Id.*  He was

allowed to use the phone once for about two minutes, but he reports never being told why he was

being detained.  *Id.*

Delkash was then transferred to the Adelanto ICE Processing Center, where he is currently in

custody.  *Id.* ¶ 15; Palacios Decl. ¶ 32.  Delkash describes that at Adelanto, he has received a bunk to

sleep in and is able to shower.  Delkash Decl. ¶ 15.  He has not been able to take the Ambien he is

prescribed for his PTSD, and has therefore struggled with sleeping.  *Id.*  He has also struggled with

eating because of his missing dental implant.  *Id.*  Delkash has requested to see a doctor, but has

been denied access to medical services as of the date of his declaration.  *Id.*

While at Adelanto, Delkash states that no officer has come to review his case or give him any

information.  *Id.*  As of the date of his declaration, he has still not been told why he was detained.

*Id.* ¶ 16.  Delkash's immigration attorney, Douglas Jalaie, has also received no explanation for

Delkash's detention.  Motion, Ex. 6 [Attorney Douglas Jalaie's Declaration in Support of *Ex Parte*

Application for Temporary Restraining Order] ("Jalaie Decl.") ¶¶ 6–9.  Jalaie spoke with Delkash's

assigned deportation officer, Lourdes Palacios, on the phone, but she did not explain the reason for

Delkash's detention.  *Id.* ¶ 8.  Jalaie also sent email inquiries, but has received no further information

on this point.  Motion, Exs. 9, 10.  The response he did receive stated only:

Your client is currently housed at the Adelanto ICE Processing Center in Adelanto, CA. Your client has not yet been presented with the documents for acquisition of a travel document for third country removal, as your client was granted withholding to Iran. This will take place in the coming days.

*Id.*, Ex. 9.

## B. Procedural Background

On July 4, 2025, Delkash filed a Petition for Writ of Habeas Corpus & Request for an Order to Show Cause (the "Petition"). [Dkt. 1]. On July 10, 2025, Delkash filed an *ex parte* application for a temporary restraining order to enjoin the government from deporting him to a third country and to order his immediate release from detention. [Dkt. 5]. The Court granted the application, in part, and ordered the government not to deport Delkash to a third country; the Court did not order Delkash's immediate release from custody. [Dkt. 7].

Delkash filed this Motion for Preliminary Injunction on July 15, 2025, the government filed an opposition on July 24, 2025, and the Court heard oral argument and took the Motion under submission on July 29, 2025. [Dkts. 8, 11, 13]. On August 4, 2025, the Court ordered the temporary restraining order extended an additional fourteen days, or until the Court rules on Delkash's Motion. [Dkt. 15].

## III. LEGAL STANDARD

To prevail on a motion for a preliminary injunction, the movant must establish that (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm absent the preliminary injunction, (3) the balance of equities tips in its favor, and (4) a preliminary injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 5, 20 (2008); *Meinecke v. City of Seattle*, 99 F.4th 514, 521 (9th Cir. 2024). Where the non-movant is a government entity, "the third and fourth factors…merge." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 695 (9th Cir. 2023) (en banc). In the Ninth Circuit, the *Winter* factors may be evaluated on a sliding scale such that "a stronger showing of one element may offset a weaker showing of another." *Id.* at 684 (citing *Recycle for Change. v. City of Oakland*, 856 F.3d 666, 669 (9th Cir. 2017). "When the balance of equities tips sharply in the plaintiff's favor, the plaintiff must

1  raise only serious questions on the merits—a lesser showing than likelihood of success." *Id*.

2  (citation omitted).

3  **IV.    DISCUSSION**

4      **A.    Jurisdiction**

5      As an initial matter, the government argues that, under 8 U.S.C. § 1252(g), this Court does

6  not have jurisdiction "to contest the government's decision to detain Petitioner pending his removal

7  pursuant to a final removal order."  Opposition at 6.  The provision states:

> Except as provided in this section and notwithstanding any other provision of law
> (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas
> corpus provision, and sections 1361 and 1651 of such title, no court shall have
> jurisdiction to hear any cause or claim by or on behalf of any alien arising from the
> decision or action by the Attorney General to commence proceedings, adjudicate cases,
> or execute removal orders against any alien under this chapter.

12  8 U.S.C. § 1252(g).

13      This section does not prohibit the Court from hearing Delkash's claims here.  It is true that

14  this Court cannot review the substance of Delkash's final order of removal nor prohibit ICE from

15  detaining him at all.  But Delkash does not ask the Court to stay his removal from the United States

16  under any circumstances.  He simply asks, in sum, for (1) "advance notice and an opportunity to

17  have a hearing . . . to determine the lawfulness of re-detention prior to taking [him] into custody," (2)

18  an "opportunity to assert his fear of removal" before being removed to a third country, and (3) an

19  order "[p]rohibit[ing] ICE from transferring the Petitioner to another detention center outside the

20  court's jurisdiction until a decision has been rendered."  Petition at 18 [Dkt. 1].  In other words,

21  Delkash is challenging his detention on statutory and constitutional process grounds rather than

22  challenging the order of removal itself.  Indeed, the Supreme Court has held that "habeas corpus

23  proceedings remain available as a forum for statutory and constitutional challenges to post-removal-

24  period detention."  *Zadvydas v. Davis*, 533 U.S. 678, 688 (2001); *see also Marquez v. I.N.S.*, 346

25  F.3d 892, 896 (9th Cir. 2003) (holding the district court has jurisdiction over a habeas claim where

26  the petitioner claims detention violates substantive and procedural due process rights).

27      The Court therefore finds that Section 1252(g) does not preclude it from exercising

28  jurisdiction over Delkash's Petition.

1        **B.**    ***Winter* Factors**

2            **1.  Likelihood of Success**

3            Detention, release, and removal of individuals ordered removed—including those, like

4    Delkash, with pending "withholding only" proceedings—is governed by 8 U.S.C. § 1231(a).

5    *Johnson v. Arteaga-Martinez*, 596 U.S. 573, 578 (2022).  A noncitizen shall be removed within 90

6    days of the removal order, subject to a potential 90-day extension.  8 U.S.C. § 1231(a)(1).  However,

7    once that period passes, and the noncitizen is not removed, they "shall be subject to supervision

8    under regulations prescribed by the Attorney General," which include statutorily mandated

9    conditions.  *Id*. § 1231(a)(3).  The noncitizen may be detained beyond the removal period under

10    certain conditions, but "if released, shall be subject to the terms of supervision in paragraph (3)."  *Id*.

11    § 1231(a)(6).

12            Moreover, 8 C.F.R. § 241.13(h) reiterates that "[t]he order of supervision shall include all of

13    the conditions provided in section [1231(a)(3)]," as well as the conditions in "[8 C.F.R.] § 241.5, and

14    shall also include the conditions that the alien obey all laws . . . ."  In other words, even without a

15    formal order of supervision, the released noncitizen is subject to certain conditions of release

16    provided by statute and regulations, and ICE maintains its ability to detain the noncitizen outside the

17    90-day removal period.  *See Johnson v. Guzman Chavez*, 594 U.S. 523, 528–29 (2021) (holding that

18    "an alien may be detained beyond the removal period or released under supervision" if they meet

19    certain conditions).

20            Alongside the regulations establishing conditions of release are the regulations establishing

21    the *revocation* of that release.  *See* 8 C.F.R. §§ 241.4(l), 241.13(i); *Guzman Chavez*, 594 U.S. at 529

22    (citing 8 C.F.R. § 241.4 as "setting out procedures DHS must follow to impose continued detention"

23    after the removal period).  Both 8 C.F.R. § 241.4(l)(3) and § 241.13(i)(3) provide that, upon

24    revocation of release, the noncitizen (1) "will be notified of the reasons for revocation of his or her

25    release" and (2) will be given "an initial informal interview promptly after his or her return to

26    Service custody to afford the alien an opportunity to respond to the reasons for revocation stated in

27    the notification."  If the noncitizen continues to be detained after the informal interview, they shall

28    be scheduled for the "normal review process."  8 C.F.R. § 241.4(l)(3); 8 C.F.R. § 241.13(i)(2) ("[I]f

1   the alien is not released from custody following the informal interview . . . the provisions of § 241.4

2   shall govern the alien's continued detention pending removal."). "The normal review process will

3   commence with notification to the alien of a records review and scheduling of an interview, which

4   will ordinarily be expected to occur within approximately three months after release is revoked." *Id.*

5   § 241.4(l)(3). In simpler terms, in order to revoke release, the government must notify the

6   noncitizen of the ***reason*** for the revocation and give them both an ***informal and formal interview***.

7           Here, none of that required process was followed.[2]

8           First, Delkash was never notified of the reasons for revocation of his release. When Delkash

9   was re-detained on June 24, 2025, the ICE agents who arrested him told him to "get out of the car or

10  we will shoot you" because they had "a federal warrant for you because you are from Iran." Delkash

11  Decl. ¶¶ 11–12. Delkash states he has never seen the warrant, and, except the brief statement that he

12  is "from Iran," has not been told why he was detained. *Id.* ¶¶ 12, 15. Delkash's immigration

13  attorney has also received no explanation for his detention. Jalaie Decl. ¶¶ 6–9; Motion, Exs. 9, 10.

14  The government states in its Opposition that Delkash "knows exactly why he was ordered

15  removed—his criminal activities . . . ." Opposition at 7. But Delkash's removal was ordered then

16  withheld 24 years ago; the government cannot conflate the reason for removal with the reason for

17  revocation of release. And there is scant evidence in front of this Court that explains why Delkash's

18  release was revoked—only a vague, *ex post facto* declaration from deportation officer Lourdes

19  Palacios that states "it was determined that Delkash was subject to arrest" because of his "lengthy

20  history of arrests, and criminal convictions." Palacios Decl. ¶ 26. More importantly, there is zero

21

22

23  ---

24  [2] Delkash also argues that it is likely that the government will "not provide any individualized notice
    to the Petitioner or an opportunity to respond before he is removed to a third country." Motion at 13.

25  While the government asserts that it intends to deport Delkash to a third country, it appears that that
    country has not yet been identified. *See* Opposition at 8. Thus, the Court cannot find that the

26  government has yet violated Delkash's due process rights in this regard. The Court cautions,
    however, that the government is required to follow its laws and regulations for removing noncitizens

27  to third countries, in addition to its rules regarding re-detention. *See* 8 U.S.C. § 1231(b); 8 C.F.R. §
    241.15.

28

1    evidence that Delkash was told why he was detained, even when his immigration attorney requested

2    an explanation.  *See* Jalaie Decl. ¶¶ 6, 8.

3         Second, there is no evidence that Delkash has been afforded an informal or formal interview.

4    The government argues that Delkash "had ample due process available to him back when he was

5    ordered removed."  Opposition at 7.  But claiming that process provided 24 years ago negates the

6    need to provide process ***now***—upon re-detention—defies credulity.  The 90-day mandatory

7    detention period under Section 1231 has long since passed, and it cannot be used to justify Delkash's

8    re-detention without the required procedures.

9         Both of these failures by the government are in clear violation of the due process

10   requirements of 8 C.F.R. §§ 241.4(l)(1) and 241.13(i)(3).  It is well established that government

11   agencies are required to follow their own regulations.  *United States ex rel Accardi v. Shaughnessy*,

12   347 U.S. 260, 268 (1954).  A growing number of courts have unequivocally found that the

13   government's failure to follow its release revocation procedures—in particular the failure to give a

14   detainee the required notice and interview—renders the re-detention unlawful.  *See Hoac v. Becerra*,

15   No. 2:25-cv-01740-DC-JDP, 2025 WL 1993771, at *4 (E.D. Cal. July 16, 2025) ("Because there is

16   no indication that an informal interview was provided to Petitioner, the court finds Petitioner is

17   likely to succeed on his claim that his re-detainment was unlawful."); *Ceesay v. Kurzdorfer*, No. 25-

18   cv-267-LJV, 2025 WL 1284720, at *21 (W.D.N.Y. May 2, 2025) ("[B]ecause ICE did not follow its

19   own regulations in deciding to re-detain Ceesay, his due process rights were violated, and he is

20   entitled to release."); *Liu v. Carter*, No. 25-3036-JWL, 2025 WL 1696526, at *3 (D. Kan. June 17,

21   2025) ("[B]ecause officials did not properly revoke petitioner's release pursuant to the applicable

22   regulations, that revocation has no effect, and petitioner is entitled to release."); *Rombot v. Souza*,

23   296 F. Supp. 3d 383, 387–88 (D. Mass. 2017) (holding that ICE's failures to follow the release

24   revocation procedures in 8 C.F.R. § 241.4 rendered the petitioner's detention unlawful).

25        The Court is persuaded that the reasoning of these sister courts is correct.  These procedures

26   are not optional or discretionary; they must be followed, and failure to do so renders the detention

27   unlawful.  For that reason, the Court finds that Delkash is likely to succeed on his claim that the

28   government did not properly revoke his release pursuant to 8 C.F.R. §§ 241.4 and 241.13.

### 2. Irreparable Harm

"It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).  Where, as here, the "alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Warsoldier v. Woodford*, 418 F.3d 989, 1001–02 (9th Cir. 2005) (quoting Wright, Miller, & Kane, Federal Practice and Procedure, § 2948.1 (2d ed. 2004)).  To be sure, "unlawful detention certainly constitutes 'extreme or very serious'" injury which "is not compensable in damages." *Hernandez v. Sessions*, 872 F.3d 976, 999 (9th Cir. 2017).  Delkash has shown evidence that he has been deprived of due process (*i.e.*, notice and an opportunity to be heard regarding the revocation of his release), likely rendering his re-detention unlawful.

Moreover, the Ninth Circuit has recognized the "irreparable harms imposed on anyone subject to immigration detention," including "subpar medical and psychiatric care in ICE detention facilities." *Id*. at 995.  Delkash has articulated the subpar conditions he has been subject to while in detention, including a lack of medical care related to his PTSD and the loss of his dental implant during arrest.

Accordingly, this factor weighs strongly in favor of granting the Motion.

### 3. Balance of Equities and Public Interest

Finally, the balance of equities and public interest "tips sharply" in favor of Delkash.  As the government notes, "[t]he public interest in enforcement of United States immigration laws is significant."  Opposition at 10 (citing *United States v. Martinez-Fuerte*, 428 U.S. 543, 556–58 (1976)).  This certainly includes enforcement of the immigration laws that provide processes for revoking release and deporting noncitizens to third countries.  If the government is allowed to eschew these processes, it cannot guarantee the accuracy of the outcome.  *See Ceesay*, 2025 WL 1284720, at *1, 12 ("Procedure is not mere puffery, a gesture that is irrelevant so long as the result is correct." "After all, without due process, there is no way to tell whether the result is in fact correct.").  Further, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*,

1   82 F.4th 664, 695 (9th Cir. 2023) (en banc) (citation omitted).  The government's argument that

2   Delkash's requested relief will "interfere with Respondents' enforcement of immigration laws

3   without proper justification" is specious.  *See* Opposition at 10.  Indeed, a deprivation of due process

4   is undoubtedly proper justification for injunctive relief.  Because Delkash has shown a likelihood

5   that it is indeed unlawful, this factor also weighs strongly in his favor.

**V.    CONCLUSION**

For the reasons state herein, Petitioner Omid Delkash's Motion for Preliminary Injunction is

granted.  Respondents are ordered to immediately release Delkash from Respondents' custody, and

Respondents are enjoined and restrained from re-detaining or removing Delkash to a third country

without notice and an opportunity to be heard.[3]

To be clear, this Order does not provide Delkash with blanket immunity from future

removal—that is outside the Court's power for the reasons discussed above—but any future

enforcement actions after release must comply with the required procedures.

Dated: August 28, 2025

Hernán D. Vera
United States District Judge

---

[3] Federal Rule of Civil Procedure 65(c) requires that, prior to granting injunctive relief, the Court require a movant to pay security "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  "Despite the seemingly mandatory language, Rule 65(c) invests the district court with discretion as to the amount of security required, if any."  *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (quoting *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003)) (quotation modified).  Accordingly, the Court waives the bond requirement here, as it is unlikely that the government will incur any significant cost and requiring a bond "would have a negative impact on plaintiff's constitutional rights, as well as the constitutional rights of other members of the public."  *Baca v. Moreno Valley Unified Sch. Dist.*, 936 F. Supp. 719, 738 (C.D. Cal. 1996) (citation omitted).